[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10624

_____

D.C. Docket No. 7:12-cv-00028-HL

MELISSA SIMPSON,
SABRINA ROBERTS,
on behalf of themselves and all those similarly situated,

Plaintiffs - Appellants,

versus

SANDERSON FARMS, INC.,
PERRY HAUSER, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(March 7, 2014)

Before MARCUS and EDMONDSON, Circuit Judges, and VINSON,[*] District
Judge.

_____

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida,
sitting by designation.

MARCUS, Circuit Judge:

Plaintiffs Melissa Simpson and Sabrina Roberts appeal the dismissal of a putative class action suit brought under the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1961-68. In this case, we must determine whether these two former employees of a poultry processing plant owned by Sanderson Farms, Inc. have stated a civil RICO claim under the pleading standard articulated by the Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). More precisely, we examine today whether the plaintiffs have alleged enough facts plausibly to establish two things: first, that they were actually injured; and, second, that the claimed predicate RICO violations were a proximate cause of the injury. The plaintiffs have attempted to show injury in the form of depressed wages. They further claim that the defendants proximately caused depressed wages by falsely attesting -- in violation of 18 U.S.C. § 1546 -- that their illegal employees presented genuine work-authorization and identification documents. The district court dismissed the amended complaint for failing plausibly to show proximate cause.

The essential problem with the amended complaint is that it offers virtually no real evidence to plausibly suggest either injury or proximate cause. The only wage data even mentioned in the amended complaint show that the plaintiffs actually received increasing wages at the plant. In attempting to plead injury

2

nonetheless, the plaintiffs have presented only a conclusory market model that is stated at a very high order of abstraction. That model does not permit the plausible inference of injury, nor does it plausibly establish that the defendants' alleged violations of § 1546 directly caused the plaintiffs' wages to become depressed. Accordingly, we affirm.

## I.

It is by now clear that to state a prima facie civil RICO claim under 18 U.S.C. § 1964(c), a plaintiff must establish "three essential elements": first, that the defendant committed a pattern of RICO predicate acts under 18 U.S.C. § 1962; second, that the plaintiff suffered injury to business or property; and, finally, that the defendant's racketeering activity proximately caused the injury. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 265-68 (1992).

We review de novo the dismissal of a civil RICO complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). See Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352, 1359 (11th Cir. 2011). At this stage in the proceedings, we accept as true the facts as the plaintiffs have alleged them. Id. Additionally, "[w]e may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even

considered by the court below." Powers v. United States, 996 F.2d 1121, 1123-24 (11th Cir. 1993).

The facts as pled and the procedural history are straightforward. Plaintiffs Simpson and Roberts formerly worked at a poultry processing plant in Moultrie, Georgia. Defendant Sanderson Farms, Inc. owns the Moultrie plant, which employs over 1,500 workers and is one of the largest employers in Colquitt County. Simpson worked at the plant from 2008 to 2010, while Roberts worked there from 2009 to 2010. The plaintiffs were legally authorized to work in the relevant period, and both provided hourly-paid, unskilled labor. The amended complaint does not describe the plaintiffs' actual duties at the Moultrie plant, nor does it begin to explain what constitutes "unskilled" labor.

On February 16, 2012, the plaintiffs filed a putative class action suit under the federal and Georgia RICO statutes.[1] The plaintiffs named one corporate and seven individual defendants (collectively, "defendants" or "Sanderson"): Sanderson Farms, Inc., a Mississippi corporation; Jennifer Harrison Buster, Sanderson Farms' corporate human resources manager; Perry Hauser, the complex manager of Sanderson Farms' poultry processing plant in Moultrie, Georgia; Jeff

---

[1] Georgia's RICO provisions are "essentially identical to the federal RICO statutes," Morast v. Lance, 807 F.2d 926, 933 (11th Cir. 1987), and in fact the Georgia definition of "racketeering activity" expressly incorporates the federal list of predicate offenses. See O.C.G.A. § 16-14-3(9)(A)(xxix). Thus, where a plaintiff fails to state a federal claim under a particular predicate, his state-law claim under that predicate will fail as well.

Black, the plant's assistant manager; Demishia Croft, the plant's human resources manager; Aristides Carral-Gomez, a human resources employee; Janie Perales, a human resources employee; and Karina Fondon, a human resources employee.

In their first complaint, the plaintiffs alleged that Sanderson committed patterns of three substantive RICO predicate acts: violations of 8 U.S.C. § 1324(a)(3)(A) (knowingly hiring unauthorized aliens who have been brought illegally into the United States); violations of 18 U.S.C. § 1028(a)(7) (knowingly transferring, possessing, or using, without lawful authority, another person's means of identification in order to engage in unlawful activity); and violations of 18 U.S.C. § 1546 (fraud and misuse of visas, permits, and other documents). The first complaint also alleged conspiracies under 18 U.S.C. § 1962(d) and 18 U.S.C. § 1028(f). See 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."); id. § 1028(f) ("Any person who attempts or conspires to commit any offense under [§ 1028] shall be subject to the same penalties as those prescribed for the offense . . . .").

According to the complaint, this pattern of racketeering activity allowed Sanderson, since 2008, to pay depressed wages to all genuinely work-authorized employees at its chicken processing plant. Finally, the plaintiffs claimed in the

5

first complaint that each pattern of predicate acts was a "substantial and direct factor in causing the depressed wages."  Compl. ¶ 80.

On September 13, 2012, the district court dismissed the first complaint without prejudice.  See Simpson v. Sanderson Farms, Inc., 7:12-CV-28, 2012 WL 4049435, at *16 (M.D. Ga. Sept. 13, 2012).  The court determined that the plaintiffs had sufficiently pled the § 1546 predicate acts but had not adequately shown violations of § 1324(a)(3)(A) or § 1028(a)(7).  Id. at *3-11.  Without explaining its reasoning, the court also found that the plaintiffs had sufficiently alleged that they suffered injury.  Id. at *15.  Nevertheless, the court dismissed the first complaint in its entirety, concluding that the plaintiffs had failed adequately to plead -- as they were required to do -- that the surviving predicate acts (§ 1546 violations) proximately caused their alleged injury (depressed wages).  Id.

On October 5, 2012, the plaintiffs filed a new five-count amended complaint, again alleging racketeering charges grounded in both the federal and Georgia RICO laws.  Notably, they did not re-allege predicate violations of § 1324(a)(3)(A) or § 1028(a)(7), and accordingly no claims arising from those predicate acts are now before us.  The amended complaint also omitted all prior allegations of a § 1962(d) conspiracy to violate § 1324(a)(3)(A) and a § 1028(f) conspiracy to violate § 1028(a)(7).  Instead, to establish a pattern of racketeering activity, the plaintiffs exclusively invoked § 1546.

6

Section 1546(a) provides in relevant part:

Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, . . . [s]hall be fined under this title or imprisoned . . . .

18 U.S.C. § 1546(a).  Section 1546(b) additionally provides:

Whoever uses --

(1)     an identification document, knowing (or having reason to know) that the document was not issued lawfully for the use of the possessor,

(2)     an identification document knowing (or having reason to know) that the document is false, or

(3)     a false attestation,

for the purpose of satisfying a requirement of section 274A(b) of the Immigration and Nationality Act, shall be fined under this title, imprisoned not more than 5 years, or both.

Id. § 1546(b).

At this stage, the plaintiffs' theory of the case is very simple: since 2008, Sanderson has allegedly used the vehicle of § 1546 violations to hire "likely more than 300" unskilled, illegal employees at the Moultrie plant.  Am. Compl. ¶ 2.  The plaintiffs essentially say that, in the course of completing I-9 forms for illegal workers, the defendants have accepted and certified obviously fake identification documents.  This misconduct has allegedly depressed the wages that Sanderson has

7

paid to all genuinely work-authorized, hourly-paid, unskilled employees at the Moultrie plant.

Although the amended complaint states -- more than ten times -- that Sanderson pays depressed wages, the plaintiffs have not pled any data or facts that actually evince a decrease in wages over time.  In fact, the only wage data detailed in the amended complaint are statements of the plaintiffs' own Sanderson wages, which increased considerably during the relevant period.  Thus, Simpson is said to have earned a starting wage of approximately $8.50 per hour in 2008 and an ending wage of approximately $11.40 per hour in 2010 (a thirty-four-percent increase over two years), while Roberts' wage reportedly climbed from approximately $8.50 per hour in 2009 to approximately $11.55 per hour in 2010 (a thirty-six-percent increase over one year).

Rising wages notwithstanding, the amended complaint attempts to show injury by positing a gap between the hourly wages that the plaintiffs actually received at Sanderson and the wages they "would have received had the Defendants not violated § 1546."  Am. Compl. ¶ 69.  In support, the amended complaint postulates a market model.  To operate the Moultrie plant, Sanderson must employ "over 1,500" hourly-paid workers at any one time.  Id. ¶ 62.  Rather than hiring from a limited number of legal candidates, however, the defendants allegedly select from a bloated, "mixed status" pool that includes both legal and

illegal workers.  Id. ¶ 63.  The plaintiffs further allege that, compared to legal workers, illegal aliens tend to work for lower wages.  Id. ¶¶ 16, 64.  All told, the plaintiffs mean to invoke the basic logic of supply and demand: when many candidates jockey for few positions, competition among workers drives wages down.  Nevertheless, the amended complaint does not specify or even estimate the number of legal or illegal workers in the relevant market -- however that market may be defined.  Nor have the plaintiffs explained why, for the purposes of this market analysis, legal and illegal workers may be treated interchangeably.  Because the plaintiffs have nonetheless assumed that Sanderson pays the same "market hourly wage for unskilled labor" to both legal and illegal workers, Sanderson's decision to hire illegal workers has allegedly depressed the wages paid to all unskilled workers at the Moultrie plant -- legal and illegal alike.  Id. ¶ 62.

To link this theory with Sanderson's § 1546 violations, the plaintiffs have said that, "but for" the § 1546 offenses, the defendants never could have hired illegal workers in the first place.  Id. ¶ 68.  In the plaintiffs' words, Sanderson must falsify I-9 forms "to avail itself of the mixed status labor supply."  Id. ¶ 65.  Moreover, because Sanderson must hire "large numbers" of illegal workers, it cannot employ those workers off the books.  Id. ¶ 66.  This "wholesale failure to complete I-9 forms" would "dramatically increase the risk of federal prosecution,"

9

particularly since the Department of Homeland Security arrested at least twenty-five illegal workers in a 2008 raid of the Moultrie plant. Id. ¶¶ 35, 66.

Not surprisingly, Sanderson moved once again to dismiss the plaintiffs' amended complaint for failure to state a claim. Sanderson argued again that the plaintiffs had not shown injury, but-for cause, or proximate cause, and, again, Sanderson claimed that the plaintiffs had failed to introduce enough data (indeed, any data) to yield the conclusion that wages were actually depressed. Finally, Sanderson argued that the amended complaint's theory of proximate cause was merely a string of conclusory premises.

The district court dismissed the amended complaint, this time with prejudice, largely agreeing with Sanderson. The court held that the amended complaint could not survive a motion to dismiss "because it fail[ed] to allege sufficient facts to show that the § 1546 violations proximately caused depressed wages." Simpson v. Sanderson Farms, Inc., 7:12-CV-28 HL, 2013 WL 443620, at *5 (M.D. Ga. Feb. 5, 2013). The trial court reasoned that the plaintiffs could not rely on pre-Twombly precedent to prove the sufficiency of their pleadings, that actual data was required to support the wage depression claim, that the plaintiffs' but-for causation argument was wholly conclusory and not supported by any actual data or facts, and, finally, that the plaintiffs had not shown a direct causal link between injury and injurious conduct.

10

The plaintiffs timely appealed from the order dismissing their amended complaint.

## II.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Specifically, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). The plausibility standard is met only where the facts alleged enable "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A plaintiff cannot rely on "naked assertion[s] devoid of further factual enhancement." Id. (alteration in original) (internal quotation marks omitted). Rather, a complaint must present sufficient factual matter, accepted as true, to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. A plaintiff need not plead "detailed factual allegations," but he must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

11

When measured against these pleading standards, the amended complaint does not come close to stating a plausible claim for relief under the federal or Georgia racketeering statutes. It is indisputable that 18 U.S.C. § 1964(c) requires RICO plaintiffs to prove both an "injury to business or property," see Avirgan, 932 F.2d at 1577, and proximate cause linking the defendants' pattern of racketeering activity with the injury that the plaintiffs suffered, see Holmes, 503 U.S. at 265-68. Sanderson does not contest that depressed wages, if sufficiently pled, could qualify as an injury to a "business interest." See Williams v. Mohawk Indus., Inc. (Mohawk II), 465 F.3d 1277, 1286-87 (11th Cir. 2006) (per curiam) (holding that employees could plead RICO injury by showing that employer depressed wages). Thus, the first issue in this case involves the level of factual specificity required to establish injury (that wages were actually depressed) at the pleading stage.

We have had little occasion to answer this question since the rulings in Twombly and Iqbal. In fact, by our count, we have only once applied the new plausibility standard to evaluate the question of RICO injury at the pleading stage. See AstraZeneca, 634 F.3d at 1364-69 (affirming dismissal order in RICO case because "insurers have not alleged plausible economic injury"). Nevertheless, because this is not a close case, we need not engage in any creative legal analysis to conclude that the plaintiffs have not plausibly shown injury.

The plaintiffs accuse Sanderson of depressing wages, but the only actual wage data in the amended complaint say that the plaintiffs' wages rose -- and not inconsiderably, at that.  Thus, we are told, Simpson earned a thirty-four-percent wage increase over her two years at Sanderson, while Roberts earned a thirty-six-percent increase in her one year working there.  Of course, the mere fact that their wages increased does not preclude the plaintiffs from showing depressed wages. If, absent Sanderson's misconduct, the plaintiffs' wages would have increased substantially more than thirty-four and thirty-six percent, respectively, and if that wage depression would have directly resulted from a pattern of racketeering activity, then the plaintiffs could have adequately pled a RICO claim.

The problem here, however, is that the plaintiffs have pled injury at only the highest order of abstraction and with only conclusory assertions.  They have offered no market data that might permit us plausibly to infer a gap between the wages they actually received at Sanderson and the wages they would have received but for the alleged § 1546 misconduct.  Certainly, the plaintiffs have provided no direct evidence of lost profits.  They have not, for example, offered or even estimated the wages paid by any comparable poultry processing plant employers in the relevant market, in the state, or even in the region -- let alone attempted to distinguish between the wages paid by those employers who hire illegal workers and those who do not.  See Lehrman v. Gulf Oil Corp., 500 F.2d 659, 667 (5th Cir.

13

1974) (establishing that plaintiffs may prove injury by showing "the profits of business operations that are closely comparable to the plaintiff's").[2] Nor does the amended complaint state or even suggest that the plaintiffs' wages decreased -- or even increased at a slower rate -- after Sanderson began hiring illegal workers. See id. (explaining that a plaintiff can establish injury by "compar[ing] the plaintiff's profit record prior to the violation with that subsequent to it"). In fact, according to the amended complaint, Sanderson has employed illegal workers at the Moultrie plant since the plant opened in 2005. See Am. Compl. ¶ 25. The plaintiffs offer no comparators to wages before that time.

Unable to marshal any empirical data in their favor, the plaintiffs rely instead on a vague market theory. They insist that there are enough illegal workers in the mixed-status labor pool to logically infer the depression of wages paid to legal workers. In certain markets, that is surely true. See De Canas v. Bica, 424 U.S. 351, 356-57 (1976) (recognizing that "acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens" (emphasis added)). The conclusion is not self-evident in all markets, however, and the

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

plaintiffs have alleged no facts to render it plausible here. In other words, they have provided no parameters and no data to ground an abstract market theory.

To begin with, the plaintiffs have entirely failed to describe the relevant labor market in quantifiable terms. They have not so much as estimated the number of unskilled workers in the market, nor have they stated -- or offered literally any suggestion as to how we might even guess -- what percentage of that workforce is work-authorized. This missing population data is essential to the plaintiffs' theory of harm. Wages are depressed, the plaintiffs say, because Sanderson opened the market to undocumented labor and thereby increased the number of workers in the market who are willing to work for less. This increased supply of low-wage workers has allegedly forced wages down.

Whatever its abstract appeal, this conclusion is unsupported by any concrete facts or data in the amended complaint. Holding all else equal, any set number of illegal workers will affect wages less perceptibly in larger markets. Indeed, in a large enough market, the wage impact of any given number of illegal workers may even be de minimis. Here, the plaintiffs have suggested neither the number of illegal, unskilled workers in the market (the relevant "numerator") nor the total number of unskilled workers in the market (the relevant "denominator"). What's more, they have failed to plead the relevant population data even in the smaller universe of the Moultrie plant. The plaintiffs have said that Sanderson has hired at

15

least three hundred undocumented workers since 2008. That's the numerator. But the plaintiffs have not pled the corresponding denominator. While they have claimed that the Moultrie plant employs 1,500 workers at any one time, they have not so much as estimated the number of workers hired at the plant -- in total -- since 2008. By their own admission, the rate of turnover in the poultry processing industry is "extremely high." Am. Compl. ¶ 17. Without at least some demographic information, we cannot plausibly infer whether the presence of illegal workers has <u>actually</u> depressed wages in a wholly nebulous labor market or in the more limited confines of the Moultrie plant.

Moreover, the plaintiffs have failed even to identify the relevant <u>geographic</u> market, leaving us with no frame of reference. Although the plaintiffs have alleged that Sanderson's Moultrie plant is "one of the largest employers in Colquitt County, Georgia," that assertion does not tell us whether their claims implicate the market across the entire county, some subset of the county, or some larger geographic region -- say, a series of contiguous counties. <u>Cf.</u> <u>Mohawk II</u>, 465 F.3d at 1289 ("[W]holesale illegal hiring depresses wages for the legal workers <u>in north Georgia</u> where Mohawk is located." (emphasis added)).

The Supreme Court has "repeatedly observed that Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws." <u>Holmes</u>, 503 U.S. at 267 (citations omitted). Under our post-<u>Twombly</u> precedent, rule-of-

16

reason[3] antitrust plaintiffs must always "present enough information in their complaint to plausibly suggest the contours of the relevant geographic . . . market[]." Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1336 (11th Cir. 2010). Here, where the plaintiffs' theory of injury also undeniably relies on assertions about a relevant market, we think the analogy is particularly appropriate. According to the plaintiffs, legal-market wages are higher than mixed-status wages at least in part because the market supply of legal labor is "limited." But because the plaintiffs have failed to offer any population data, and have neglected to provide any geographic frame of reference, we find it difficult, if not impossible, plausibly to conclude that the legal labor supply actually is limited. Presumably, there are other legal workers in contiguous counties and nearby places who might choose to work at Sanderson, or who might move nearby to obtain employment. In the face of Plaintiffs' market-based theory of harm, we think it not too much to expect the pleading to tell us something more about the relevant geographic market.

---

[3] Rather than draw a comparison to rule-of-reason cases, the plaintiffs would have us analogize RICO to cases involving antitrust violations per se, for which the injurious effect is presumed at the pleading stage. The plaintiffs cite no case law in support of their proposed analogy, and, indeed, our RICO precedent expressly forecloses it. Rather than presuming injury at the pleading phase, we have already established that, after Twombly, we will affirm the dismissal of a civil RICO complaint that does not articulate enough facts to "allege[] plausible economic injury." AstraZeneca, 634 F.3d at 1364-70.

17

In fact, our antitrust precedent requires plaintiffs to plead factual support for all manner of market claims.[4] In Jacobs, for instance, we said that while the "parameters of a given market are questions of fact," a rule-of-reason complaint must contain sufficient information to plausibly define the relevant product market.[5] Id. at 1336. Ultimately, we held that the Jacobs plaintiffs failed to plead actual harm because, "beyond the bald statement that consumers lost hundreds of millions of dollars, there [was] nothing establishing the competitive level above which [the defendant's] allegedly anti-competitive conduct artificially raised prices." Id. at 1339. In this case, the plaintiffs have similarly relied on the bald assertion that "[t]he Scheme saves Sanderson millions of dollars in labor costs."

---

[4] The plaintiffs cite to an antitrust case, Palmyra Park Hospital Inc. v. Phoebe Putney Memorial Hospital, 604 F.3d 1291 (11th Cir. 2010), to argue that we will accept vague descriptions of "economic forces" as factual at the pleading stage. Pet'r's Rep. Br. 15-16. But Palmyra does not stand for the broad principle that the plaintiffs extract from it. Contrary to their characterization, the Palmyra complaint actually alleged a plethora of specific market facts. See Compl. ¶ 2, Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp., No. 08-00102 (M.D. Ga. July 3, 2008) (describing a specific and limited market); id. ¶¶ 16-35 (giving highly specific descriptions of the tying and tied markets); id. ¶¶ 36-38 (showing reasons why the market was limited and could not easily adjust); id. ¶ 44 (showing a precise injury of $18 million in lost patient revenues); id. ¶¶ 45-55 (providing specific data on defendant hospital's market share and market power); id. ¶¶ 55-59 (noting admissions from insurance companies that their contracts with defendant hospital precluded them from doing business with plaintiff hospital); id. ¶ 64 (deploying expert analysis to compare average healthcare costs across geographic markets).

[5] The plaintiffs insist that market details are not available pre-discovery and should not be required at the pleading phase. Our antitrust precedent specifically rejects that argument. The Jacobs plaintiffs argued that their complaint had been erroneously dismissed, claiming that they were entitled to "add facts in discovery" about market share and product substitutability. 626 F.3d at 1338. In response, we explained that accepting the plaintiffs' argument "would absolve [plaintiffs] of the responsibility under Twombly to plead facts 'plausibly suggesting' the relevant submarket's composition." Id. Here, the plaintiffs cannot similarly invoke discovery to avoid pleading some specific market details.

Am. Compl. ¶ 16.  Jacobs tells us that, without more facts, such a naked market claim fails plausibly to demonstrate the fact of injury.

We do not mean to suggest that the plaintiffs were required to plead all of this market data in order to make a plausible showing of injury.  We have no occasion to say how much data would have been enough, and we do not mean to announce a comprehensive list of strategies for showing plausible injury in similar cases.  Our conclusion here is instead much simpler: because the plaintiffs' theory of injury turns peculiarly on assertions about the relevant labor market, the amended complaint cannot plausibly show injury without pleading any of these market facts or data.

The plaintiffs cannot state a claim unless they "raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  Since the plaintiffs have conceded that their own Sanderson wages actually increased, and since they have offered no facts to establish that they were injured nonetheless, their allegations of depressed wages invite us to speculate.  Although the plaintiffs have not shown or offered any data about the prevailing market wage, we might guess that employers who hire only legal workers pay a higher rate.  While the plaintiffs have not identified the geographic market, we might also guess that it includes Colquitt County and parts of the surrounding area.  And although the plaintiffs have not even estimated the number of legal and illegal workers in that geographic market,

19

we might surmise that there are enough illegal workers to force wages down at least somewhat.  But after Twombly and Iqbal, this speculation does not state a claim.  The plaintiffs have therefore failed to allege § 1964(c)'s injury element "above the speculative level."

Section 1964(c) also requires a civil RICO plaintiff to show -- plausibly -- that his injury occurred "by reason of" a defendant's pattern of racketeering activity.  In this case, because the plaintiffs have failed to plead even the fact of wage depression, they have failed a fortiori to show that Sanderson's alleged § 1546 violations caused wage depression in even a "but-for" sense.  Plainly, there is no such thing as a "but for" cause of something that did not happen.

But even if we were to assume that the amended complaint established injury and but-for cause, the plaintiffs still have failed to adequately plead that their injury occurred "by reason of" Sanderson's alleged § 1546 misconduct.  As the Supreme Court has interpreted § 1964(c), a civil RICO plaintiff must always establish a proximate-causal, "direct relation" between the injury and injurious conduct at issue.  See Holmes, 503 U.S. at 268.  To qualify as a direct cause of a plaintiff's injury, a RICO defendant's misconduct must have been a "substantial factor in the sequence of responsible causation."  Mohawk II, 465 F.3d at 1288 n.5 (quoting Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1399 (11th Cir. 1994), modified on other grounds by 30 F.3d 1347 (11th Cir. 1994)).  The pattern

20

of RICO predicate acts need not be the "sole cause" of a plaintiff's injury, see Cox, 17 F.3d at 1399, but a plaintiff must indisputably show that a defendant's racketeering activity was more than merely a "but for" cause of harm. See Holmes, 503 U.S. at 268; Green Leaf Nursery v. E.I. DuPont De Nemours & Co., 341 F.3d 1292, 1307 (11th Cir. 2003); Beck v. Prupis, 162 F.3d 1090, 1095-96 (11th Cir. 1998), aff'd, 529 U.S. 494 (2000).

Here, the plaintiffs have effectively conceded that their theory of proximate cause is just but-for cause repackaged. In the amended complaint, for example, they have attempted to establish proximate cause by stating that "the violations of § 1546 are a direct and substantial cause of the depressed wage rates." Am. Compl. ¶ 69. But the plaintiffs cannot plausibly establish proximate cause merely by tacking a conclusory allegation onto their high-level market claims. In their Opening Brief, moreover, they say that the amended complaint "explains precisely how the § 1546 violations are an essential step in the hiring process of illegal aliens at the Plant, not just the 'but for' cause. . . ." Pet'r's Br. 23. But to identify an "essential step" in a process is merely to claim that, "but for" that step, the process could not proceed. These allegations are not nearly enough to establish a plausible direct connection between the alleged misconduct -- violations of § 1546 -- and depressed wages.

21

The Supreme Court recognized a directness requirement in the civil RICO cause of action in part to avoid the difficulty involved in "ascertain[ing] the damages caused by some remote action." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 458 (1991). That concern is proper here. In the plaintiffs' proposed theory of causation, § 1546 violations are undeniably remote from depressed wages. Section 1546 violations may be an "essential step" in the defendants' scheme, but they are not the only -- or even the final -- step.

With enough factual support, this attenuated, multi-step causal theory could still be "direct." Indeed, we have previously held that, with the proper facts alleged, a plaintiff can show a proximate-causal link between § 1546 violations and wage depression. See Mohawk II, 465 F.3d at 1294 (holding, on the facts of that case, that an employer's alleged § 1546 violations were "neither indirect nor too remote" to be a proximate cause of employees' depressed wages). In this case, however, the amended complaint does not contain sufficient facts to establish a plausible direct relation between the remote § 1546 violations and the allegedly depressed wages. The plaintiffs have failed to render wage depression the "natural consequence" of Sanderson's alleged § 1546 misconduct. See Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 658 (2008). Even if we credit the amended complaint's causal chain in the simplest but-for sense, the plaintiffs have alleged no facts whatsoever to suggest that the labor market necessarily operates in the

22

manner they hypothesize.  See Hemi Group, LLC v. City of New York, 559 U.S. 1, 14-15 (2010) (plurality opinion) (no proximate cause where plaintiff's injury did not "necessarily" follow from defendant's RICO predicate acts and connection was not "straightforward").  Without pleading population data, the relevant geographic market, before-and-after wage rates, or wage data from comparable poultry processing plant employers, the plaintiffs have failed to define too many crucial, operative variables in their theory of causation.  The multi-step causal chain they posit is not straightforward, and, at least on these pleadings, the relationship between injury and injurious conduct is not direct.

In short, the amended complaint was properly dismissed for failing to establish two of the essential elements of the § 1964(c) cause of action.  The plaintiffs have not plausibly pled either the fact of injury, or a proximate-causal link between Sanderson's alleged § 1546 violations and depressed wages.

III.

The plaintiffs lean heavily on Mohawk II, 465 F.3d 1277, where this Court affirmed the denial of a motion to dismiss a civil RICO complaint that alleged, among other things, a direct relation between an employer's § 1546 violations and the depressed wages of legal workers.  Mohawk II is inapposite for two reasons.  First, Mohawk II is distinguishable because it presented sharply different facts.  In

23

the second place, even if the two cases had been more analogous, the pleading standard applied in Mohawk II has since been abandoned by the Supreme Court.

For starters, the plaintiffs in Mohawk II alleged numerous illegal acts by the employer, not just the making of false statements. Notably, Mohawk allegedly conspired with recruiting agencies to "hire and harbor" unauthorized workers for its carpet manufacturing business. Mohawk II, 465 F.3d at 1281. The Mohawk II legal-worker plaintiffs alleged that Mohawk's employees traveled to the Mexican border, recruited "literally thousands" of undocumented workers, physically transported those workers into the relevant market, accepted fraudulent documentation from those illegal workers, took steps to shield the illegal workers from detection, and offered incentive payments to recruiters in order to hire still more illegal labor. Id. at 1281-82, 1289. Moreover, unlike the plaintiffs here, the Mohawk II plaintiffs identified the relevant geographic market as "North Georgia." Id. at 1281-82, 1289-90. And, importantly, unlike the amended complaint in this case, the Mohawk II complaint alleged that "illegal workers now constitute a majority of the work force in many of Mohawk's facilities in North Georgia." Compl. ¶ 75, Williams v. Mohawk Indus., Inc., No. 04-00003 (N.D. Ga. Jan. 6, 2004).

The RICO allegations in Mohawk II relied on all of those facts. Like this case, Mohawk II involved allegations arising under the federal and Georgia RICO

statutes.  But unlike this case, which involves at this stage only allegations of § 1546 predicate acts relating to fraud or misuse of certain documents, Mohawk II overwhelmingly concerned numerous predicate acts under § 1324, including hiring, concealing, harboring, and shielding illegal aliens, and inducing their unauthorized border-crossing.  In fact, in our ten-page discussion of the federal RICO claims at issue in Mohawk II, we never once mentioned § 1546, false attestations, or the fraudulent use of documents.  We did hold that the plaintiffs stated a Georgia RICO claim predicated upon § 1546, but, even there, we noted that the plaintiffs had alleged "hundreds, probably thousands, of violations of" § 1546.  Mohawk II, 465 F.3d at 1293-94.  Quite simply, Mohawk II is a profoundly different case.

Moreover, the Supreme Court has since abrogated the pleading standard applied by our Court in Mohawk II.  In Mohawk II, we explained that we would not affirm the dismissal of a complaint "unless it appear[ed] beyond doubt that the plaintiff [could] prove no set of facts in support of his claim."  Id. at 1282 n.2 (quoting Beck v. Deloitte & Touche, 144 F.3d 732, 735 (11th Cir. 1998)).  This "no set of facts" language in Mohawk II was pulled verbatim from Conley v. Gibson, 355 U.S. 41, 45-46 (1957), which the Supreme Court categorically retired in Twombly.  See Twombly, 550 U.S. at 562-63 (announcing that Conley v. Gibson's "no set of facts" language had "earned its retirement").

25

In fact, Mohawk II drew support from cases in other circuits that also relied on the now-abrogated Conley v. Gibson standard.  Thus, in Mohawk II, we referenced the Sixth Circuit's decision in a similar case, where that court reversed the dismissal of a RICO complaint after finding that it "could not conclude that there was no likelihood of success on the merits."  Mohawk II, 465 F.3d at 1290-91 (citing Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 619 (6th Cir. 2004)).  Mohawk II also cited to a Ninth Circuit case, Mendoza v. Zirkle Fruit Co., 301 F.3d 1163 (9th Cir. 2002), which similarly invoked the Conley v. Gibson standard.  See Mohawk II, 465 F.3d at 1286; Mendoza, 301 F.3d at 1169 ("At this stage of the proceedings, we cannot say that there is no set of facts that could be proved, to satisfy these requirements.") (internal quotation marks omitted).  Since Mohawk II relied upon the now-retired Conley v. Gibson standard, it does not control our legal analysis about the sufficiency of the pleadings in the instant case.

The plaintiffs argue nevertheless that Twombly and Iqbal are irrelevant to the Mohawk II analysis, because they claim that Mohawk II found proximate cause as a matter of law -- independent of the factual peculiarities of that case.  We are unpersuaded.  The plaintiffs point us to the following passage from Mohawk II: "Although under Georgia law the plaintiffs are limited to predicate acts arising out of 18 U.S.C. § 1546, we conclude that the plaintiffs' allegations are neither indirect nor too remote to satisfy Georgia's proximate-cause requirement under state-law

26

RICO." 465 F.3d at 1294.   Contrary to the plaintiffs' claim, however, this passage does not mean that the Court announced a conclusion of law unaffected by the nature or quality of detail the plaintiffs may have alleged.  Mohawk II did not hold (nor could it have held) that, in a civil RICO case, an employer's § 1546 violations always proximately cause its work-authorized employees' wages to become depressed.  The finding of proximate cause between Mohawk's § 1324 and § 1546 violations and depressed wages plainly was limited to the "particular factual circumstances of [that] case." Id. at 1290.

In short, the plaintiffs have failed plausibly to establish two of the elements of a civil RICO cause of action -- that they suffered an injury in the form of wage depression, or that, even if we were to assume they had plausibly shown injury and but-for cause, their injury was directly and proximately caused by Sanderson's pattern of § 1546 violations.  Accordingly, we **AFFIRM**.