[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10451
Non-Argument Calendar
_____

D.C. Docket No. 6:15-cv-01454-GAP-GJK


DYNCORP INTERNATIONAL,

Plaintiff-Appellant,

versus

AAR AIRLIFT GROUP, INC.,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(November 21, 2016)

Before TJOFLAT, MARCUS, and JILL PRYOR, Circuit Judges.

PER CURIAM:

In this diversity case, DynCorp International ("DynCorp"), a private

contractor that provides aviation and security services for the U.S. State

Department, appeals the district court's Fed. R. Civ. P. 12(b)(6) dismissal of its amended complaint, asserting trade-secret misappropriation and other claims against competitor AAR Airlift Group, Inc. ("AAR"), for failure to state a claim. On appeal, DynCorp asserts that the district court misread the Florida Uniform Trade Secrets Act and its pleading. After careful review of the record and the parties' briefs, we reverse the dismissal order and remand for further proceedings.

The essential facts, adduced from DynCorp's amended complaint and attached exhibits, are these. Since about 1992, DynCorp has contracted with the U.S. State Department's Bureau of International Narcotics and Law Enforcement Affairs to perform aviation and related services in support of the bureau's Worldwide Aviation Support Services ("WASS") program, which involves counter-narcotics and illicit drug eradication efforts in numerous countries around the world. In November 2012, the State Department posted a formal notice of its intent to solicit bids for a new WASS contract. It issued the solicitation nearly two years later, in July 2014. DynCorp and AAR each submitted a bid by the October 2, 2014 deadline. In January 2015, the State Department excluded DynCorp from the WASS competition, finding its bid fell outside the competitive range. DynCorp filed a protest, arguing the State Department had materially misevaluated its proposal. In March 2015, the State Department opted to reconsider its decision, and, in October 2015, announced it had revised the competitive range for the

2

WASS project, so that DynCorp's original proposal fell within the revised range. Pursuant to government regulations, the State Department is now required to accept revised bids, consistent with the newly revised competitive range.

In about August 2012, three DynCorp employees -- Terrance Fisher, Angela Pilkington and James Christian Thomas -- all of whom had signed confidentiality and non-disclosure agreements with DynCorp, left that company to work for AAR. Nearly three years later, on April 21, 2015, AAR part-time employee Michael Peterson, who was working on the WASS-bid project for AAR, opened an email in his personal account from Tom Cline -- Peterson's long-time professional contact and friend, and President of DynCorp subcontractor Eagle Aviation Services & Technology ("EAST").[1]  The email said, "take a look, seems bizarre," and attached what turned out to be DynCorp's "Profit Margin Analysis" ("PMA").  According to the complaint, the PMA is "a detailed spreadsheet [with] approximately twenty discrete tabs, and collectively consists of nearly 10,000 rows of confidential data [and] trade secrets about [DynCorp's] quarterly and prior performance on the Incumbent Contract, including staffing, labor, costs, profit margins, overhead, revenue and other financial data, [which] provide[d] direct insight into [DynCorp's] operations and pricing strategies on the Incumbent Contract."

---

[1] EAST also had a confidentiality agreement with DynCorp.

3

When he received the email, Peterson quickly scanned the attachment. Once he noticed that the document was related to the State Department Bureau of International Narcotics and Law Enforcement Affairs, he became concerned that it might contain sensitive information and immediately closed it. Peterson also decided to notify AAR, so he forwarded Cline's email from his personal account to his AAR email account. On May 1, 2015, when AAR's Director of Business Development Rich Walberg stepped into his office, Peterson asked him to take a look at the email and attachment. Walberg looked briefly at the attachment and immediately told Peterson to close it without viewing its content. Peterson subsequently deleted the email and attachment from his AAR email account. That same day, AAR's general counsel sent an email to the State Department's contracting officer for the WASS program, informing him of the situation.

The following day, May 2, 2015, AAR arranged for Jason Dieterle, an independent computer consultant, to go to Peterson's home to secure and image his personal computer. Two days later, on May 4, 2015, at AAR's request, Dieterle returned to Peterson's home to copy the Cline email and attachment onto a thumb drive, which he then personally delivered to the State Department's contracting officer for the WASS program. Thereafter, Peterson permanently deleted the Cline email from his personal computer and the image created by Dieterle.

Meanwhile, on April 27, 2015 -- six days after Peterson received Cline's email and four days before he notified AAR -- a former human resources manager at AAR ("the Whistleblower") notified DynCorp that AAR had misappropriated trade secrets related to DynCorp's performance on the WASS contract.  The Whistleblower said that, while AAR was preparing its original WASS bid, which had been submitted in October 2014, five members of AAR's senior management team engaged in a concerted effort to hire away Thomas, Pilkington, and Fisher from DynCorp and to induce them to disclose confidential DynCorp information for AAR to use in its WASS bid.  The Whistleblower reported that Thomas and Pilkington provided confidential and proprietary DynCorp information to AAR, while Fisher refused to do so.  On May 4, 2015 -- the same day Dieterle delivered the Cline email and attachment to the State Department contracting officer -- DynCorp notified the same State Department contracting officer that AAR had obtained DynCorp trade secrets relating to the WASS competition, which DynCorp asserted was a violation of the Procurement Integrity Act, 41 U.S.C. § 2101, et seq. The contracting officer referred the matter to the State Department's Inspector General, who is currently investigating the matter.

To protect its private rights and intellectual property, DynCorp filed suit in federal district court in September 2015.  The eight-count amended complaint alleged that AAR violated the Florida Uniform Trade Secrets Act ("FUTSA"), Fla.

Stat. § 688.001, et seq. (Count I); engaged in common-law conversion, tortious interference with contractual relations, tortious interference with existing and prospective business relations, aiding and abetting breach of fiduciary duty, unjust enrichment, and conspiracy (Counts II through VII); and violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. (Count VIII).  AAR filed a motion to dismiss the amended complaint for failure to state a claim, which the district court granted.  The district court ruled that the complaint was too vague to state a FUTSA claim and that its allegations necessarily also failed to state a claim on Counts II through VIII.  Specifically, the court found that DynCorp failed to allege with reasonable particularity the trade secrets allegedly disclosed by Thomas and Pilkington, and, while the complaint alleged that the PMA constituted a trade secret, it failed to allege that AAR had misappropriated the PMA.  The court dismissed the complaint without prejudice with leave to file a second amended complaint.  Instead of amending the complaint a second time, DynCorp filed this timely appeal.

We review a district court's dismissal of a complaint for failure to state a claim de novo, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff.  Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation omitted). This standard is met "where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 708 (11th Cir. 2014) (quoting Iqbal, 556 U.S. at 678).  Put differently, "[i]t is sufficient if the complaint succeeds in identifying facts that are suggestive enough to render [each required element] plausible."  Rivell v. Private Health Care Sys., Inc., 520 F.3d 1308, 1310 (11th Cir. 2008) (quotations omitted).

FUTSA provides for injunctive relief and/or damages where a defendant engages in "misappropriation" of a plaintiff's "trade secret[s]."  Fla. Stat. §§ 688.002-688.004.  "Misappropriation" means:

(a)  Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b)  Disclosure or use of a trade secret of another without express or implied consent by a person who:

   1.  Used improper means to acquire knowledge of the trade secret; or

   2.  At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

      a.  Derived from or through a person who had utilized improper means to acquire it;

      b.  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

7

    c.     Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    3.     Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2).  "Trade secret" means:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process that:

    (a)    Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

    (b)    Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

Florida courts adjudicating FUTSA cases have said that the "plaintiff is required to identify with reasonable particularity the trade secrets at issue before proceeding with discovery."  AAR Mfg., Inc. v. Matrix Composites, Inc., 98 So. 3d 186, 188 (Fla. 5th Dist. Ct. App. 2012); Revello Med. Mgmt., Inc. v. Med-Data Infotech USA, Inc., 50 So. 3d 678, 679 (Fla. 2d Dist. Ct. App. 2010) ("[Med-Data] concedes that before proceeding with discovery in [a trade-secret misappropriation] suit, the plaintiff must identify with reasonable particularity the nature of the trade secret involved.").  However, to satisfy this requirement at the dismissal stage in federal court, the plaintiff need only allege sufficient facts to

8

plausibly show a trade secret was involved and to give the defendant notice of the material it claims constituted a trade secret.  See Twombly, 550 U.S. at 555-56; accord AAR Mfg., 98 So. 3d at 188 (rejecting the idea that the court must make a threshold finding as to the existence of a trade secret to proceed to discovery).

First, we are unpersuaded by DynCorp's claim that the district court erred in finding that the amended complaint failed to sufficiently allege a FUTSA claim based on the PMA.  The district court concluded that, while the amended complaint showed that AAR had "obtained" the PMA, it did not show that AAR had "misappropriated" it.  That is, "the Amended Complaint [did] not contain an affirmative allegation that AAR ha[d] disclosed or used that document, so as to constitute 'misappropriation' under Fla. Stat. § 688.02(2)."  DynCorp points out that FUTSA defines misappropriation to include, not just "[d]isclosure or use" of a trade secret, Fla. Stat. § 688.02(2)(b), but also "[a]cquisition . . . by a person who knows or has reason to know that the trade secret was acquired through improper means," Fla. Stat. § 688.002(2)(a).  DynCorp maintains that the allegations in the complaint showed that Cline emailed the PMA to AAR, in violation of his confidentiality agreement with DynCorp, and AAR knew the PMA contained sensitive information that had been acquired through improper means, as evidenced by the extraordinary steps it took to notify the State Department.

9

We are not persuaded that these allegations stated a claim under FUTSA. Even construing the allegations in the light most favorable to DynCorp, they do not show that AAR <u>acquired</u> the PMA. Rather, they show that Cline -- who was a DynCorp contractor and not an agent of AAR -- sent the PMA to AAR part-time employee Peterson, and AAR took affirmative action <u>not</u> to acquire the document or its contents, to delete the document from Peterson's email accounts and personal computer, and to turn the document over to the State Department. Accordingly, we find no error in the district court's determination that the amended complaint failed to state a FUTSA claim based on the PMA.

However, we do agree with DynCorp that the district court erred in holding that the amended complaint's allegations regarding the trade secrets AAR solicited and acquired from former DynCorp employees Thomas and Pilkington did not identify the claimed trade secrets with reasonable particularity. The amended complaint alleged that "[t]he trade secrets obtained by AAR included confidential and proprietary [DynCorp] financial and technical data relating to the Incumbent [WASS] Contract, such as lists of the personnel employed by [DynCorp] to provide services under the Incumbent Contract, the salaries and pay differentials for those personnel on the Incumbent Contract, other pricing and financial data about [DynCorp's] performance on the Incumbent Contract, and technical data about [DynCorp's] staffing approach and business operations pertaining to the

10

Incumbent Contract."[2]  The amended complaint added that: "[The Whistleblower] personally observed Thomas with a large black, zippered portfolio of written material that he claimed to have taken from [DynCorp].  The binder included at least lists of [DynCorp] employees staffed on [DynCorp's] Incumbent Contract and their salary information, as well as numerous emails and other documents with [DynCorp] logos.  Witness A personally observed Thomas, on one of his first days after joining AAR, share the portfolio with the AAR bid team charged with preparing AAR's WASS bid submission."  The amended complaint further alleged that "Pilkington provided AAR with [DynCorp] confidential financial information relating to [DynCorp's] incumbent contract costs and pricing."

These allegations identified the trade secrets for which DynCorp was claiming protection with sufficient particularity to survive a motion to dismiss. The amended complaint did not just identify broad categories of information, such as financial and technical data, but specifically identified financial and technical data related to DynCorp's pre-existing WASS contract, including personnel lists,

---

[2] The district court concluded that this allegation referred to the PMA and so did not consider it in determining whether the amended complaint sufficiently identified the trade secrets AAR acquired through Thomas and Pilkington.  But this allegation appears in the section of the complaint dealing with AAR's plan to acquire confidential information from DynCorp's employees, which allegedly occurred in 2012-2014, rather than in the separate section of the complaint dealing with the PMA and Cline's emailing of that document to Peterson, which occurred in April-May 2015.  While the information AAR allegedly acquired through DynCorp's former employees may overlap with information contained in the PMA, that fact is irrelevant in determining whether the complaint sufficiently identified the trade secrets allegedly misappropriated by AAR through Thomas and Pilkington.

11

salary and pay differentials, and pricing data related to staffing and business operations. Moreover, while the allegations regarding the trade secrets divulged by Pilkington are less precise, the amended complaint was very specific in identifying the information allegedly divulged by Thomas. The amended complaint identified "written material" which included lists of employees staffed on the WASS project and salary information for those employees. The amended complaint also alleged a specific time period when Thomas divulged this information ("on one of his first days after joining AAR"), the people to whom he divulged it ("the AAR bid team"), and the "large black, zippered portfolio" in which he stored the materials. These allegations were sufficient to put AAR on notice as to what material formed the basis for DynCorp's claims.[3]  See Twombly, 550 U.S. at 555-56; AAR Mfg., 98 So. 3d at 188. Moreover, the amended complaint alleged that information about DynCorp's staffing and pricing for the WASS contract was confidential and subject to Thomas's, Pilkington's, and EAST's non-disclosure and confidentiality agreements, and that the information could be used by AAR to make its WASS bid more competitive. These allegations, taken as true, show that the information divulged by Thomas and Pilkington constituted a trade secret within the meaning of Fla. Stat. § 688.002(4).

---

[3] The district court found that the amended complaint's allegations sufficiently demonstrated that the information divulged by Thomas and Pilkington had been "misappropriated." That determination is not challenged on appeal.

12

Accordingly, we reverse the district court's dismissal of the amended complaint. We do not reach the question whether FUTSA preempts the claims raised in Counts II through VIII, which the district court also did not reach. Rather, we remand the case for proceedings consistent with this opinion, including the district court's consideration of the preemption question in the first instance.

**REVERSED AND REMANDED.**