URSULA UNGARO, UNITED STATES DISTRICT JUDGE
THIS CAUSE came before the Court on Defendant JPMorgan Chase Bank, N.A.'s Motion to Dismiss Plaintiffs' Amended Complaint (D.E. 72) (the "Motion").
THE COURT has considered the Motion, Plaintiffs' Response thereto (D.E. 74) (the "Response"), the movant's Reply in support of the Motion (D.E. 75) (the "Reply"),[1] and the pertinent portions of the record and is otherwise fully advised in the premises.
*1307 BACKGROUND
The facts below come from the Amended Complaint (D.E. 68) (the "Complaint") and are construed in the light most favorable to the plaintiffs.
On June 10, 2005, Plaintiffs Daniel Robey ("Mr. Robey") and Pamela Robey ("Mrs. Robey") (collectively, "Plaintiffs" or "the Robeys") purchased a residential lot at 127 Welding Way, Beach Mountain, Watuga County, North Carolina. Compl. ¶ 8.[2] The Robeys intended to build their home on the lot. Id.
A. The Washington Mutual Loan
Later, in order to refinance the purchase of the home, the Robeys sought to secure a loan from Washington Mutual Bank F.A. ("Washington Mutual"). Id. ¶ 10. The closing documents for the refinance loan (the "Loan") included a promissory note (the "Note") and a deed of trust (the "Deed"), which were sent by Washington Mutual to the Robeys in Miami, Florida for signature. Id. ¶ 11. On or about March 19, 2008, Mr. Robey-but not Mrs. Robey-executed the Note in the principal amount of $417,000.00 in favor of Washington Mutual. Id. ¶ 12 & Ex. A. And on or about that same date, Mr. Robey-but not Mrs. Robey-executed the Deed. Id. ¶ 13 & Ex. B.[3] According to Plaintiffs, North Carolina law requires the signatures of both husband and wife on a deed of trust. Id. ¶ 13. The Deed, once signed, purportedly encumbered the Robeys' property and purportedly secured the repayment of the Note. Id.
B. The Loan is Transferred to Chase
After the loan documents were filed, Mr. Robey made his monthly loan payments to Washington Mutual via ACH bank transfers. Id. ¶ 14. Sometime later, Mr. Robey learned on his own, through a website, that the FDIC had taken over Washington Mutual and subsequently sold its assets to JPMorgan Chase Bank, N.A. ("Chase") on September 25, 2008. Id. ¶ 15. Despite Chase's purported acquisition of all of Washington Mutual's assets, notices regarding the Note and Deed were still being sent to the Robeys from an entity called "Washington Mutual." Id. ¶ 16. The Robeys never received any notices concerning the transfer of rights in the Note and Deed of Trust. Id. ¶ 17. However, the Robeys eventually received an invoice from Chase for loan payments at their Miami, Florida address, which invoice referenced the same loan number as the Washington Mutual statements. Id. Thereafter, Mr. Robey began making Loan payments directly to Chase. Id. ¶ 18.
C. Chase Sends False Claims of Tax Nonpayment, Inexplicably Rejects Payments, Impermissibly Charges Late Fees and Collects Escrow Funds, and Misapplies the Escrow Funds
On April 3, 2009-some months after learning that Chase was now the purported holder or servicer of the Loan-Mr. Robey received a letter from "Washington Mutual" falsely accusing Mr. Robey of not *1308 paying his 2008 real estate taxes. Id. ¶ 19. While the Deed permitted Chase to escrow funds, Chase (according to Plaintiffs) waived any requirement to escrow funds in connection with the Loan, as initially the monthly Loan payments did not include money for escrows. Id. ¶ 21. In other words, the Robeys were paying taxes and insurance directly. Id. Thus, having received the correspondence falsely accusing Mr. Robey of not paying his taxes, Mr. Robey promptly sent Chase, by certified mail, his paid tax bill from Watauga County for the year 2008. Id. ¶ 22. Notwithstanding Mr. Robey's providing proof of paying the tax bill, and despite Mr. Robey's multiple written communications and phone calls concerning the issue, Chase never responded or otherwise acknowledged the tax payment. Id. ¶¶ 23-24.
On or about April 20, 2009, Chase-still operating under the name "Washington Mutual"-also refused to accept some of Mr. Robey's monthly Loan payments. Id. ¶ 20. Unbeknownst to Plaintiffs, the rejected Loan payments were incurring significant late fees, which-as Plaintiff alleges "upon information and belief"-were improperly added to the Robeys' Loan balance, making it difficult for Mr. Robey to afford the added expenses. Id. ¶ 24. Chase never explained why it refused to accept Mr. Robey's payments and never informed him to what extent they were adding penalty fees, even though these fees were triggered by Chase's refusal to communicate with Mr. Robey. Id. ¶ 25.
Further, despite the fact that Chase was not escrowing funds for the Loan, Chase unilaterally escrowed funds, also causing the Loan balance to grow beyond what it should have been, which in turn made it difficult for Mr. Robey to keep the Loan current under the terms of the Note and Deed. Id. ¶ 26. "Upon information and belief," not only did Chase lack the authority to escrow monies, when it did escrow monies, it did so in a grossly inaccurate fashion. Id. ¶ 27. The Loan payment history provided by Chase to Mr. Robey is not clear as to what the purpose was for the inappropriately escrowed monies, as the escrowed amounts do not correlate with any purported expenses associated with the Loan. Id. ¶¶ 27-28 & Ex. C. Moreover, Chase failed to allocate the escrow money consistent with the priority order set forth in the Deed's express terms. Id. ¶¶ 29-30.
D. The Alleged Loan Default and Pre-Foreclosure Workout Efforts
Due to the misapplication of the escrow funds, the Loan appeared to be in default. Id. ¶ 31. In other words, had the escrow monies been applied correctly, the Loan would not have been in default at the time Chase declared it so. Id.
On September 7, 2010, the Robeys received a letter from Chase claiming that the Loan was in arrears. Id. ¶ 32. In that correspondence, Chase expressly indicated that it was a debt collector attempting to collect a debt. Id.
Only eight days later, on September 15, 2010, Chase delivered a letter notifying the Robeys of Chase's intent to foreclose on the property to recover the balance of the Loan. Id. On October 6, 2010, the Robeys received another letter from Chase, which stated in part: "You have missed more than one monthly payment. You are in danger of damaging your credit and losing your home. We'll try and find an option for getting you back on track." Id. ¶ 34.
On November 10, 2010, Chase sent a letter to the Robeys encouraging them to modify their Loan. Id. ¶ 35. On November 17, 2010, Mr. Robey received another letter from Chase, which stated in part: "Your house is your home we want to keep it that way"; "the longer you delay calling us the fewer chances you may have to save your home"; and "your only chance of saving *1309 your home is by calling us immediately." Id. ¶ 36. Also on November 17, 2010, Chase sent another letter to the Robeys, telling them that the Loan may be eligible for a "workout." Id. ¶ 37. On that same date, Chase sent a letter of acceleration and another notice of intent to foreclose. Id.
Having received mixed signals, Mr. Robey responded to the foregoing letters by providing copies of negotiated Loan payment checks. Id. ¶ 38. The Robeys received nothing in response other than letters similar to the ones referenced above. Id. Consequently, on January 26, 2011, Mr. Robey sent a RESPA[4] Qualified Written Request ("QWR")[5] to Chase Financial LLC's office in Jacksonville, Florida, requesting a full accounting of his Loan payments. Id. ¶ 38 & Ex. D.[6] Mr. Robey did not receive a response to his QWR until after Chase commenced foreclosure proceedings. Id. ¶ 40.
E. The Foreclosure Filing and Post-Filing Workout Efforts
On January 20, 2011, Chase commenced an action to foreclose on the property in Watauga County, North Carolina, case number 11 SP 12. Id. ¶¶ 39, 51. "Upon information and belief," the Loan was never in default to justify initiating foreclosure proceedings. Id. ¶ 49.
On February 8, 2011, Chase responded to the QWR only to say that it was "investigating" the request. Id. ¶ 40. Chase also responded to Mr. Robey's request by stating "Chase respectfully declines to release the original loan documents to you." Id. ¶ 41. Chase did *1310 not provide the requested accounting information relative to the Loan payments, the escrow funds and their application. Id.
Fearing the loss of his home, Mr. Robey decided to request a loan modification, hoping to also deal with the payment and escrow dispute during that process. Id. ¶ 43. On February 9, 2011, the Robeys received a letter confirming that Chase had initiated a loan modification with Mr. Robey. Id. ¶ 42. During the period of time when Mr. Robey attempted to modify the Loan, he hired at least two local law firms to help him with the process. Id. ¶ 44. While Chase assured Mr. Robey that it was interested in modifying the Loan, despite multiple efforts to do so over a lengthy period of time, Chase never authorized a modification. Id. Instead, Chase continued to send meaningless letters regarding the loan modification. Id. Chase continued to ignore the QWR information requests, all in an intentional effort to seek foreclosure of the property rather than attempting to resolve the various issues with the Loan. Id. ¶¶ 44, 50-51.
On March 9, 2011, Chase again responded to the QWR to say that it was "working" on the requests. Id. ¶ 45. Chase again failed to provide the requested information. Id.
On April 21, 2011, in an untimely manner under RESPA regulations, Chase provided another response to the QWR indicating that $2,700.00 had been applied to a suspense account without explanation. Id. ¶ 46. Per Plaintiffs, the placement of this money into a suspense account was erroneous and inappropriate. Id. Chase still did not provide the requested accounting information. Id. On May 26, 2011, Chase once again responded to the QWR and once again failed to provide the requested information without explanation. Id. ¶ 47.
On February 10, 2012, Chase notified the Robeys that it had charged the Robeys for forced placed insurance. Id. ¶48. The Robeys immediately filed proof of fully-paid hazard insurance, and Chase therefore was required to cancel the forced placed insurance. Id. While Chase did cancel the forced placed insurance, Chase apparently erroneously charged the Robeys for same. Id.
According to Plaintiffs, all of the above actions by Chase reflect an attempt to "wrongfully, recklessly and intentionally push[ ]" the Robeys into foreclosure rather than appropriately handle the Loan. Se id. ¶¶ 50-51.
F. The Course of the Foreclosure Proceedings
Because North Carolina is a non-judicial foreclosure state, Chase (through its lawyers) had to hire a Substitute Trustee to execute the foreclosure. Id. ¶ 52. Under North Carolina law, a substitute trustee is supposed to have a fiduciary relationship with both the lender and the borrower, being equally impartial to both. Id. Generally, a substitute trustee's job is to make sure everything concerning the subject loan and default is processed properly under North Carolina law. Id.
In the Robeys' case, the Substitute Trustee was employed by Trustee Services of Carolina, LLC. Id. ¶ 53. "Upon information and belief," this was a for-profit company formed, owned, operated, and controlled by the law firm that Chase hired. Id.
The Robeys hired a North Carolina lawyer to assist in the foreclosure proceeding. Id. ¶ 55. The lawyer discovered that the note had a blank endorsement and that the note apparently had never been assigned to Chase, leaving Chase with no standing to enforce the Note through foreclosure proceedings. Id. The Robeys' lawyer provided notice to Chase's lawyers, the Substitute Trustee, and the foreclosure clerk for the non-judicial foreclosure that the Robeys were contesting the foreclosure based on the standing issue and the fact that the Loan was not actually in default. Id. Nevertheless, Chase's lawyers, the Substitute Trustee, and the clerk of court proceeded with the foreclosure. Id. ¶ 56.
The Robeys, desperate to save their home, and on the advice of counsel, filed for bankruptcy in the United States Bankruptcy Court in the Southern District of Florida in hopes of stopping the sale of the property and to attempt to rectify the issues with the Loan. Id. ¶ 57. Nonetheless, during the bankruptcy proceedings, Chase and its lawyers falsely represented that the Loan was in default. Id. ¶ 58. "Upon information and belief," Chase filed a false proof of claim regarding the defaulted Loan amount through an individual claiming to be a Vice President of Chase, "when it appears she was not." Id. The bankruptcy filing failed to stop the sale of the property. Id.
Furthermore, after the home was sold, Mr. Robey for the first time noticed that the Deed contained a forgery of Mrs. Robey's signature. Id. ¶ 59. Mr. Robey provided the Loan documents to an expert, who confirmed the forgery and also noted that the notary acknowledgment was fabricated/fraudulent. Id. Mrs. Robey never signed the Deed nor the Note. Id. Plaintiffs believe that "someone" fraudulently and deliberately forged Mrs. Robey's signature in efforts to make the Deed valid under North Carolina law. Id. ¶ 60. The Deed was also deficient in that: (1) the Deed listed the property as being located in Avery County, North Carolina, rather *1311 than Watuga[7] County, North Carolina; (2) it reflects that it purportedly was notarized in Miami, Florida, while the Robeys never signed any Loan documentation before a notary in Miami; (3) the notary's form of attestation is the form used for an individual, yet the notary purportedly notarized both the Robeys' signatures on one document; and (4) while the notary form notes that a driver's license was presented by the Robeys, there is no notation of a driver's license number(s).Id. ¶ 61. According to Plaintiffs, the forged Deed therefore is void ab initio , rendering any foreclosure sale premised thereon unenforceable and ineffective to transfer any interest in the property. Id. ¶ 62. Again, despite the void Deed and the lack of any default on the Loan, Chase, its lawyers, the Substitute Trustee and the clerk of court proceeded with the foreclosure and authorized the foreclosure sale of the property to the highest bidder. Id. ¶¶ 60, 63. The Robeys were evicted from their property, which since has been re-sold to a third party. Id. ¶¶ 64-66.
G. Procedural History
Plaintiffs commenced this action on March 19, 2018. D.E. 1. As it pertains to Chase,[8] Plaintiffs' operative Complaint alleges wrongful foreclosure (Count I), fraud (Count II), violation of the Florida Deceptive and Unfair Trade Practices Act[9] ("FDUTPA") (Count III), malicious prosecution (Count IV), civil RICO[10] claims pursuant to 18 U.S.C. §§ 1962 & 1964 (Count V), conversion (Count VI), negligence (Count VII), gross negligence (Count VIII), breach of the implied covenant of good faith and fair dealing (Count IX), quiet[11] title (Count X), RESPA violations pursuant to 12 U.S.C. § 2605 (Count XI), violations of the Fair Debt Collections Practices Act ("FDCPA")[12] (Count XII). D.E. 69.[13]
Through the instant Motion, Chase seeks to dismiss the Complaint in its entirety with prejudice. The Motion is now ripe for disposition.
LEGAL STANDARD
Federal Rule of Civil Procedure 8(a)(2) provides that a plaintiff's pleading "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has stated that a plaintiff must submit "more than an unadorned, *1312 the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. (quoting Bell Atl. Corp. v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ).
In considering a motion to dismiss for failure to state a claim, the "plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " Simpson v. Sanderson Farms, Inc. , 744 F.3d 702, 708 (11th Cir. 2014) (quoting Iqbal , 556 U.S. at 678, 129 S.Ct. 1937 ) ). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " Iqbal , 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly , 550 U.S. at 557, 127 S.Ct. 1955 ) ). Although "[a] plaintiff need not plead 'detailed factual allegations[,] ... a formulaic recitation of the elements of a cause of action will not do,' " and the plaintiff must offer in support of its claim "sufficient factual matter, accepted as true, to 'raise a right to relief above the speculative level.' " Simpson , 744 F.3d at 708 (quoting Twombly , 550 U.S. at 555, 127 S.Ct. 1955 ) ).
In deciding a motion to dismiss, a district court must "limit[ ] its consideration to the pleadings and exhibits attached thereto." Grossman v. Nationsbank, N.A. , 225 F.3d 1228, 1231 (11th Cir. 2000) (internal quotations omitted). "When exhibits attached to a complaint contradict a plaintiff's general and conclusory allegations, the exhibits govern despite a court's duty to accept a plaintiff's allegations as true." Kinsey v. MLH Fin. Servs., Inc. , 509 F. App'x 852, 853 (11th Cir. 2013) (citing Griffin Indus., Inc. v. Irvin , 496 F.3d 1189, 1205-06 (11th Cir. 2007) ). Where the attached exhibits negate the cause of action alleged, dismissal is appropriate. See Griffin Indus. , 496 F.3d at 1205-06 (reversing district court's denial of qualified immunity at motion to dismiss stage and noting that, in light of the 21 exhibits to the complaint, "[Plaintiff's] problem is not that it has said too little, but that it has said too much").
ANALYSIS
Chase moves to dismiss under Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6). Specifically, Chase argues:
1. Venue is improper, as venue for this case would lie (if anywhere) in Watauga County, North Carolina-not Miami, Florida;
2. The action is barred by the Rooker-Feldman doctrine, as Plaintiffs' lawsuit is a collateral attack on the state court foreclosure judgment;
3. The action is barred by res judicata and collateral estoppel, as the North Carolina foreclosure case was adjudicated on the merits and the claims here were or could have been brought in that suit;
4. The action is barred by the Noerr-Pennington doctrine and Florida's litigation privilege, at least to the extent the claims are based on wrongful litigation and prelitigation activities; and
5. Each claim independently fails to state a claim for relief, mandating dismissal under Rule 12(b)(6).
The Court is persuaded that Chase is correct on its venue argument. Accordingly, the Court declines to reach the remaining issues raised in the Motion.
*1313 I. VENUE DOES NOT LIE IN THIS DISTRICT
Venue generally is governed by 28 U.S.C. § 1391. Under that statute, a civil action may be brought in:
(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or
(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.
28 U.S.C. § 1391(b).
A defendant may challenge venue as improper by filing a motion under Federal Rule of Civil Procedure 12(b)(3). "When venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b). If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under [ 28 U.S.C.] § 1406(a)." Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex. , 571 U.S. 49, 56, 134 S.Ct. 568, 187 L.Ed.2d 487 (2013).
RESPA has its own venue provision, laying venue as proper only in "the district in which the property involved is located, or where the violation is alleged to have occurred." 12 U.S.C. § 2614.[14]
When a defendant challenges venue as improper, the plaintiff bears the burden of showing that the venue selected is proper. See Delong Equipment Co. v. Washington Mills Abrasive Co. , 840 F.2d 843, 845 (11th Cir. 1988) ; Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc. , 669 F.Supp.2d 1353, 1356 (S.D. Fla. 2009). A court must accept all allegations of the complaint as true, unless contradicted by affidavits submitted by the defendant. Hemispherx Biopharma , 669 F.Supp.2d at 1356 (citing Wai v. Rainbow Holdings , 315 F.Supp.2d 1261, 1268 (S.D. Fla. 2004) ).
a. RESPA Venue
As an initial matter, the Southern District of Florida is the improper venue under RESPA's venue provision. The Property is located in North Carolina. And the district "where the violation is alleged to have occurred" would be the one where Chase acted, or failed to act, in with regard to the acquisition of the Loan from Washington Mutual, the QWR, and the collection and application of escrow monies. Nothing in the Complaint suggests Chase took any of those actions or inactions in the Southern District of Florida. Cf.
*1314 Duenas v. Wells Fargo Bank, N.A. , 705 F. App'x 837, 838-39 (11th Cir. 2017) ("If Wells Fargo violated RESPA, the violation occurred when Wells Fargo failed to timely provide a written acknowledgement of receipt of Duenas's information request. That violation occurred wherever Wells Fargo failed to create, or untimely created, its written acknowledgment. The complaint does not allege that Wells Fargo wrote, or would have written, its acknowledgment in Florida."); Crenshaw v. Specialized Loan Serv., LLC , 668 F. App'x 713, 714 (11th Cir. 2017) (violation occurs wherever the loan servicer acts, not where the plaintiff or his attorneys act).
From the facts alleged in the Complaint, venue for Plaintiff's RESPA claim lies in the Western District of North Carolina,[15] where the property is sited, or the Middle District of Florida, where Chase received the QWR (see Compl. Ex. D).
b. Transactional Venue
The Complaint first alleges: "Venue is proper in this District in that, at all times material the Plaintiffs were and are residents of this District and a significant number of events or omissions giving rise to the claims occurred in this District including but not limited to the signing of the underlying loan documents by Daniel Robey, which in large part are the subject of the claims asserted herein." Compl. ¶ 7. By referencing "a significant number of events or omissions giving rise to the claims," Plaintiffs appear to be invoking § 1391(b)(2) -however, the number of events or omissions is not the correct standard. Rather, the venue analysis focuses on whether a substantial part of the events or omissions giving rise to the claim occurred in this district, or a substantial part of the property that is the subject of the action is situated. 28 U.S.C. § 1391(b)(2) (emphasis added).
In analyzing whether the Southern District of Florida events or omissions are a "substantial part" of the claims, the Court must "focus on relevant activities of the defendant, not of the plaintiff." Jenkins Brick Co. v. Bremer , 321 F.3d 1366, 1371-72 (11th Cir. 2003) (quoting Woodke v. Dahm , 70 F.3d 983 (8th Cir. 1995) ); accord Tauriga Sciences, Inc. v. Cowan, Gutenski & Co., P.A. , No. 15-CV-62334, 2016 WL 5661631, at *2 (S.D. Fla. Sept. 30, 2016) ; Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc. , 669 F.Supp.2d 1353, 1356-57 (S.D. Fla. 2009). Only the defendant's activities "that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered." Jenkins Brick , 321 F.3d at 1371 ; accord Tauriga Sciences , 2016 WL 5661631, at *2.
"While certain kinds of events may be necessary to give rise to the claim, only those actions which were, in and of themselves, wrongful or had a close nexus to the wrong could form the basis of proper venue." Hemispherx Biopharma , 669 F.Supp.2d at 1357 (alterations and quotations omitted) (quoting Forbes v. Lenox Fin. Mortg., LLC , No. 08-60455-CIV, 2008 WL 2959727, at *3 (S.D. Fla. July 30, 2008) ). For example, in Jenkins Brick , the plaintiff/employer argued that venue for its breach-of-non-compete-agreement suit was proper in Alabama, because the employer conducted business primarily in Alabama, the defendant/employee's salary and benefits came from Alabama, and the employee sent his executed employment agreement to the employer in Alabama. 321 F.3d at 1368, 1372-73. Nevertheless, the Eleventh Circuit held that the particular conduct giving rise to the breach of non-compete *1315 occurred in Georgia; the Alabama-related facts "[did] not have a close nexus with the cause of action for breach of contract, and they [were] therefore irrelevant" for venue purposes. Id. As such, Alabama-based activities were a part of the claims, but not a "substantial part" of the activities "giving rise to" the cause of action.
Similarly, in Forbes v. Lenox Financial Mortgage, LLC , the plaintiffs and defendants had reached an agreement whereby the plaintiffs would process mortgage closings for all of the defendants' customers in the State of Florida. 2008 WL 2959727, at *1. The defendants then allegedly reneged on the agreement. Id. The plaintiffs filed suit in the Southern District of Florida for breach of contract, unjust enrichment, fraud in the inducement, and tortious interference with business relations. Id. The plaintiffs argued that venue was proper because "a substantial number of the properties for which closings at issue in this lawsuit occurred were located in this judicial district." Id. at 2. Specifically, 600 out of the 2,000 closings at issue occurred in this District. Id. Nevertheless, the defendants were a mix of individual Georgia residents and Georgia corporations. Id. They argued that the fact that the closings took place in Florida had relatively little to do with the plaintiffs' specific causes of action (i.e., the formation and breach of the contract, the commission of any potential torts, etc.). Id. According to the defendants, the alleged events giving rise to the causes of action occurred in Georgia, and any connection between the plaintiffs' claims and Florida was tenuous. Id. The court agreed, noting that, "[w]hile these closings were necessary to give rise to [the plaintiffs'] causes of action, they are not the proximate cause of and have no 'close nexus' with [the plaintiffs'] claims for breach of contract, unjust enrichment, fraud, and tortious interference." Id. at *3. Again, Florida-based activities were a part of the story of the case, but nevertheless a "substantial part" of the conduct giving rise to these specific claims did not occur in Florida.
1. The Complaint demonstrates that a "substantial part" of Chase's actions giving rise to the claims occurred in North Carolina, while other "substantial parts" of Chase's actions giving rise to the claims are not assigned a location
So what acts or omissions have been alleged by Plaintiffs of Chase that would "give rise" to Plaintiffs' claims? Of those acts, did a "substantial part" of them take place in the Southern District of Florida? Viewing the allegations in the light most favorable to Plaintiffs, the Complaint relies on the following key acts:
(1) the Robeys purchased the Property, which is sited in North Carolina;
(2) Mr. Robey, but not Mrs. Robey, executed the Deed-this allegedly occurred in Miami, but was not an action by Chase;
(3) Chase took over the Loan without notifying the Robeys-the Complaint is silent on from where Chase should have sent its notification[16] ;
(4) the Robeys sent (from Miami), and Chase received and responded, various correspondence regarding Loan payments, the Loan balance, taxes, escrow funds, the QWR, the foreclosure and potential workouts/modifications-the Complaint is silent on where Chase received, *1316 and from where Chase responded to, this correspondence;
(5) Chase refused to accept Loan payments-the Complaint is silent on where Chase would or should have accepted these payments, i.e., to where Plaintiffs attempted to send the Loan payments;
(6) Chase collected and inappropriately allocated escrow funds and forced place insurance charges-the Complaint is silent on where these actions occurred;
(7) at some point, "someone" (Compl. ¶ 60) forged Mrs. Robey's name on the Deed-the Complaint does not allege this act occurred in this District, nor that Chase is the actor responsible for the forgery;
(8) the Deed was purportedly notarized by a notary in Miami, even though the Robeys never signed any loan documentation before a notary in Miami-again, even assuming this act occurred in this District, it was not an action by Chase;
(9) Chase falsely declared the Robeys to be in default and commenced foreclosure proceedings in North Carolina-the foreclosure proceedings obviously commenced in North Carolina, and the Complaint is silent on from where Chase declared the Loan default; and
(10) Chase, its lawyers, the Trustee and the Clerk of Court pushed forward in the North Carolina foreclosure action, despite the myriad deficiencies and fraudulent Deed, until a foreclosure was consummated and the Robeys were evicted-these actions all occurred in North Carolina.
Plaintiffs also allege that Chase filed a fraudulent proof of claim in their Southern District of Florida bankruptcy case, but a careful review of the specifically-enumerated causes of action shows that this bankruptcy proceeding is not a central part of the claims-the bankruptcy is not mentioned even once in the enumerated counts' 73 paragraphs, while the North Carolina foreclosure proceedings and Chase's specific loan servicing activities (which occurred at unspecified locations, though the correspondence attached to the Complaint as Exhibit D suggests Jacksonville, Florida) are mentioned repeatedly. Moreover, Plaintiffs do not allege that Chase's fraudulent activity in the bankruptcy led to the foreclosure.
With this in mind, Plaintiffs have failed to demonstrate that a "substantial part" of Chase's acts or omissions giving rise to these specific causes of action occurred in this District. Chase's connection to this District vis-à-vis the claims in this case appears to be ancillary and indirect-for example, even if the Deed was fraudulently notarized in this District, and even if the fraudulent notarization was done at Chase's instruction (a finding that would require an inferential leap, based on the wishy-washy allegations in the Complaint), the notarization alone would not be the proximate cause of Plaintiffs' claims. Rather, the notarization is akin to the mortgage closings in Forbes ; the notarization may have been a necessary precondition to the foreclosure action, but it was not the proximate cause of and has no "close nexus" with Plaintiffs' claims. See 2008 WL 2959727, at *3.
Other cases analyzing venue for claims like Plaintiffs' support this conclusion. For example, a "substantial part" of the events surrounding a wrongful eviction (tantamount to wrongful foreclosure) occurs in the place from where the plaintiff was evicted. Westley v. Alberto , 703 F. App'x 727, 728-31 (11th Cir. 2017) (affirming transfer to this District of claims arising from allegedly fraudulent eviction, "[g]iven *1317 that the property in question was in Miami and the events at the center of the complaint overwhelmingly took place in Miami"). So too with quiet title claims. Cf. Johnson v. District Director of I.R.S. , No. 76-1091A, 1976 WL 909, at *1 (N.D. Ga. 1976) ("To the extent that plaintiff seeks to quiet title to the real property in question, it is clear that such action is in the nature of an in rem proceeding and should have been brought in the State of Maryland where the property lies and where venue will also lie."). This is also true of in personam claims against persons who allegedly conspired and committed fraud to deprive a plaintiff of property. See Riley v. Donatelli , No. 3:16-cv-898-J-34JBT, 2017 WL 3316479, at *9 (M.D. Fla. Aug. 3, 2017) (RICO and fraud claims arising from allegedly-wrongful interference in lawsuit over New York property belonged in New York, based on the submission of false documents to the New York court and the "purported theft of the real property located in New York,"; even if the plaintiff "received correspondence related to the New York lawsuit in Florida, and may have felt the effects of the purportedly wrongful conduct while living in Florida," the heart of the dispute was in New York). Here, too, Plaintiffs have not satisfied their burden of establishing transactional venue under § 1391(b)(2).
c. Residential Venue
The Complaint next alleges that: "[W]hile the Defendant is a citizen of another state it regularly conducts business in this District, including but not limited to the servicing of the subject loan. Said servicing included the appearance of the Defendant in a bankruptcy court in this District. While servicing the Robey's loan Chase communicated with the Robeys in this District. They also communicated with the Robey's lawyer in this District. The loan documents also include a purported notary attestation from a notary located in this District. The Robey's contend that the notary attestation is fraudulent." Compl. ¶ 7 (grammatical errors in original).
The Complaint's venue paragraph (¶ 7) does not expressly state that Chase "resides" in this district, which may be why Chase's Motion addresses only venue under § 1391(b)(2). Nevertheless, in their Response, Plaintiffs appear to argue that the above-stated facts establish that Chase "resides" in this district;[17] Chase's Reply addresses this argument accordingly. See Response at 6-7; Reply at 2-3. The Court will do the same.
For venue purposes, a defendant-corporation such as Chase is deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2). And, in a multi-district state like Florida, the personal jurisdiction analysis is limited to contacts specifically in the Southern District of Florida "as though this district were a separate state," rather than the State of Florida at large. Id. § 1391(d) ; Amerisure Ins. Co. v. Auchter Co. , No. 1:15cv235-MW/GRJ, 2016 WL 9506024, at *2 (N.D. Fla. Apr. 4, 2016). The Court therefore starts by analyzing whether Chase is subject to this Court's personal jurisdiction with respect to the claims *1318 here-even though Chase did not move to dismiss under Federal Rule of Civil Procedure 12(b)(2).
Since Chase is incorporated in Delaware with its principal place of business in New York, two requirements must be satisfied for the Court to have personal jurisdiction over Chase. See Cable/Home Commc'n Corp. v. Network Prods., Inc. , 902 F.2d 829, 855 (11th Cir. 1990). First, the Court must determine whether the requirements of the applicable state statute governing personal jurisdiction are satisfied. See Miami Breakers Soccer Club v. Women's United Soccer Ass'n , 140 F.Supp.2d 1325, 1327 (S.D. Fla. 2001). Second, the Court must determine whether its exercise of personal jurisdiction meets the requirements of the due process clause of the Fourteenth Amendment. See id. (citing Future Tech. Today, Inc. v. OSF Healthcare Sys. , 218 F.3d 1247, 1249 (11th Cir. 2000) ).
The applicable state statute governing personal jurisdiction here is Florida's long-arm statute, Florida Statutes § 48.193(1)(a)(2). "The Florida long-arm statute provides two bases for the exercise of personal jurisdiction: specific and general jurisdiction." PVC Windoors, Inc. v. Babbitbay Beach Const., N.V. , 598 F.3d 802, 808 (11th Cir. 2010) ; accord Prou v. Giarla , 62 F.Supp.3d 1365, 1375 (S.D. Fla. 2014). "General jurisdiction refers to the power of the forum state to exercise jurisdiction in any cause of action involving a particular defendant, regardless of where the cause of action arose." Id. at 808 n.8 (citing Oldfield v. Pueblo De Bahia Lora, S.A. , 558 F.3d 1210, 1220 n.27 (11th Cir. 2009) ). In contrast, specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum. Id. at 808 (quotations omitted).
Here, Plaintiffs allege that this Court may exercise personal jurisdiction over Chase because: (1) Chase "regularly conducts business" in this District, including the servicing of the subject Loan (Compl. ¶¶ 4, 7); (2) both Chase and its predecessor, Washington Mutual, sent Loan-related correspondence to Plaintiffs in this District (id. ¶¶ 7, 11, 17); (3) Chase made false representations, including a fraudulent proof of claim, regarding the Loan in Plaintiffs' bankruptcy proceedings before the U.S. Bankruptcy Court for the Southern District of Florida (id. ¶¶ 7, 57-58); and (4) the Deed was purportedly notarized by a notary in Miami (id. ¶¶ 7, 61). See also Resp. at 10. Chase has not submitted any affidavits to dispute these allegations. Therefore, the Court accepts these facts as true and draws all reasonable inferences in Plaintiffs' favor. See Hemispherx Biopharma , 669 F.Supp.2d at 1356. Nevertheless, Plaintiffs still carry the initial burden of proving venue is proper. See Delong Equipment Co. , 840 F.2d at 845 ; Hemispherx Biopharma , 669 F.Supp.2d at 1356.
1. Plaintiffs have not established that this Court has general personal jurisdiction over Chase
Plaintiffs have not alleged sufficient facts to support this Court's exercise of general personal jurisdiction over Chase. Though Plaintiffs allege that Chase "regularly conducts business in this District," Compl. ¶ 7, the allegations do not support that Chase is "essentially at home" in Florida. See Daimler AG v. Bauman , 571 U.S. 117, 137-39, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014) (the "paradigm" bases for a forum's exercise of general jurisdiction are a corporation's place of incorporation and principal place of business, but general jurisdiction may also be exercised where a corporation's affiliations with the state are so "continuous and systematic as to render it essentially at home in the forum State" (internal quotations and alterations omitted) ); see also *1319 Johnston v. Multidata Sys. Int'l Corp. , 523 F.3d 602, 610 (5th Cir. 2008) ("[V]ague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction."); Amerisure Ins. Co. , 2016 WL 9506024, at *3 ("Under Daimler AG , doing business in a state is not enough to establish general jurisdiction." (internal quotations omitted) ).
2. Plaintiffs have not established a close nexus between this venue and the specific claims asserted, and therefore have not established that this Court has specific personal jurisdiction over Chase
Nor have Plaintiffs alleged sufficient facts to support the exercise of specific personal jurisdiction based on the particular claims in the Complaint.
Chase argues that Plaintiffs' allegations do not establish Chase's "direct affiliation, nexus, or substantial connection" with this District in relation to Plaintiffs' claims. Reply at 2-3; see also Walden v. Fiore , 571 U.S. 277, 284, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014) ("For a State to exercise [specific] jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."); Waite v. All Acquisition Corp. , 901 F.3d 1307, 1313-15 (11th Cir. 2018) (to exercise specific personal jurisdiction without violating due process, the defendant's activities in the forum state must be a "but-for" cause of the plaintiff's claim). The Court agrees. "Due process requires that a defendant be haled into court in a forum State based on [its] own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." Walden , 571 U.S. at 286, 134 S.Ct. 1115 (quoting Burger King v. Rudzewicz , 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (2014) ).
That Chase may have sent correspondence to the Robeys in this District does not, without more, establish specific personal jurisdiction. Cf. Adhikari v. KBR, Inc. , No. 1:15-cv-1248, 2016 WL 4162012, at *7 (E.D. Va. Aug. 4, 2016) (even though defendant/corporation leased office space in Virginia and sent communications into Virginia, these facts did not give rise to plaintiffs' claims of human trafficking abroad and could not form the basis of specific personal jurisdiction). Likewise, the notarization-related contact with this District is ancillary and indirect and does not establish Chase's "substantial connection" to this District. Further, as explained above, even if the notarization was done at Chase's behest, nothing suggests the locale of the notarization was anything more than a "random, fortuitous, or attenuated contact[ ]" which cannot support specific jurisdiction. See Walden , 571 U.S. at 286, 134 S.Ct. 1115. The notarization would have little significance if the Deed had not been used to encumber the North Carolina property and for the North Carolina foreclosure process.
Next, as explained above, Chase's participation in the Florida bankruptcy proceeding does not give it "fair notice" that it would be haled into the United States District Court for the Southern District of Florida following the foreclosure of the Property. The bankruptcy proceeding appears to be incidental (rather than central) to the claims of wrongful foreclosure, quiet title, fraud, and the like. Finally, the generic and conclusory allegations of general loan servicing in this District do not establish specific jurisdiction over Chase. Cf. King v. Caliber Home Loans, Inc. , 210 F.Supp.3d 130, 137 (D.D.C. 2016) ("[The plaintiffs] do not allege that [loan servicer] sold them their mortgage from an office in the District of Columbia, nor do they claim that they sent payments or documents to a [loan servicer] office in the District of Columbia,"
*1320 and therefore did not establish District of Columbia court's specific jurisdiction over servicer); see also Yellen v. U.S. Bank, N.A. , 301 F.Supp.3d 43, 47 (D.D.C. 2018) (general allegation that "the Banks have transacted business in this District, and...have committed acts proscribed by the False Claims Act in this District" insufficient to establish either specific or general jurisdiction). In fact, the only non-conclusory content showing the location of Chase's servicing activities is the QWR addressed to Jacksonville, Florida. Compl. Ex. D.
In sum, Plaintiffs have not satisfied their burden of establishing residential venue under § 1391(b)(1) in this District based on the claims against Chase.
II. TRANSFER IN LIEU OF DISMISSAL
Having determined that this suit was brought in the wrong district, the Court must decide, under 28 U.S.C. § 1406(a), the proper disposition of Chase's motion. Chase has requested that the Court dismiss the action for improper venue. Nevertheless, the Court has discretion to transfer the action instead of dismiss, "if it be in the interest of justice." 28 U.S.C. § 1406(a) ; see also RMS Titanic, Inc. v. Zaller , 978 F.Supp.2d 1275, 1303 (N.D. Ga. 2013) ("Whether to dismiss or transfer is within the discretion of the Court." (citing Pinson v. Rumsfeld , 192 Fed. App'x 811, 817 (11th Cir. 2006) ; Naartex Consulting Corp. v. Watt , 722 F.2d 779, 789 (D.C. Cir. 1983) ) ).
Neither Chase nor Plaintiffs address § 1406(a) or otherwise explain why the interest of justice would not warrant transfer to the Western District of North Carolina. However, upon review of the record of this case-and particularly given that the acts underlying Plaintiff's claims occurred between 2009 and 2015-this Court finds that transfer is warranted. See, e.g. , Goldlawr, Inc. v. Heiman , 369 U.S. 463, 466, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962) ( § 1406(a) transfer option intended to avoid "the injustice which had often resulted to plaintiffs from dismissal of their actions merely because they had made an erroneous guess with regard to the existence of some elusive fact of the kind upon which venue provisions often turn"). As described at length above, the locus of operative facts is in Watauga County, North Carolina. The Complaint also suggests that the bulk of non-party witnesses (e.g., the Trustee, the Clerk of Court, and others involved in the foreclosure proceeding) will be in that district. Further, without conducting an exhaustive choice-of-law analysis, it seems likely that North Carolina law would apply to Plaintiffs' state-law claims, and the United States District Court for the Western District of North Carolina is more familiar with North Carolina law. See also Compl. Ex. B at ¶ 16 (governing law provision in Deed states that the applicable law will be "federal law and the law of the jurisdiction in which the Property is located," which is North Carolina).
Accordingly, it is hereby
ORDERED AND ADJUDGED that Motion (D.E. 72) is GRANTED IN PART as prescribed above. It is further
ORDERED AND ADJUDGED that the Clerk of Court is DIRECTED TO TRANSFER this action the United States District Court for the Western District of North Carolina. It is further
ORDERED AND ADJUDGED that all pending motions, including the motions to dismiss under Rules 12(b)(1) and 12(b)(6) raised in the underlying Motion,[18] are DENIED AS MOOT. It is further *1321 ORDERED AND ADJUDGED that all hearings are CANCELLED. It is further
ORDERED AND ADJUDGED that the Clerk of Court SHALL administratively close this case following transfer to the proper jurisdiction.
DONE AND ORDERED in Chambers at Miami, Florida, this 4th day of December, 2018.

The Court herein cites to the page numbers located at the bottom of the Motion, Response, and Reply, rather than the page numbers assigned by CM/ECF at the top of the documents.

But see id. Ex. B at 3 (identifying the property address as "127 Wedling Weg, Beech Mountain, North Carolina"); id. Ex. C (same); id. Ex. D (same). See also id. ¶¶ 22, 56 (referencing tax bills and foreclosure proceedings in "Watagua County"); id. ¶¶ 39, 54 (foreclosure proceedings in "Watauga County"); cf. id. ¶ 61 ("the property was actually located in Watuga County"); id. ¶ 69 (referencing the "Clerk of the Watuga County court"). Plaintiffs are encouraged to spell check their future filings.

The copy of the Deed attached to the Complaint as Exhibit B contains signatures for both borrowers, Daniel Austin Robey and Pamela D Robey. See id. Ex. B at 15. Plaintiffs allege that the signature for Pamela D Robey is a forgery. Id. ¶ 59.

Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 et seq.

See 12 U.S.C. § 2605(e).

Plaintiffs also allege that the QWR includes a request to see the original Note, as Mr. Robey was never notified that Chase formally took over his Loan or became the servicer of the Loan or both. Id. ¶ 38. The QWR attached to the Complaint, however, contains no such request; it requests only "a detailed mortgage transaction account history" for the Loan. See id. Ex. D.

See supra n.2.

Plaintiffs also purports to sue Defendants Does 1-20, though the Complaint is devoid of allegations pertaining to these Doe defendants other than as follows: "Defendants, DOES 1-20 are persons or entities that may be responsible for the wrongs alleged herein whose identities are unknown to Plaintiffs despite efforts to determine their identity." Compl. ¶ 5.

§ 501.204, Fla. Stat.

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq.

Written in the Complaint and in Plaintiffs' Response as "Quite Title."

15 U.S.C. §§ 1692 et seq.

In their Response to the instant Motion, Plaintiffs purport to "drop, without prejudice, the following counts": Counts III, IV, V, VI, IX, XI, and XII. D.E. 74 at 2. This portion of the Response does not comport with the Federal Rules of Civil Procedure. If Plaintiffs wanted to voluntarily dismiss less than all of the counts in the operative Complaint-bearing in mind that the Complaint has already been amended once as a matter of right-then they needed to seek leave of Court to file a second amended complaint. See, e.g., Campbell v. Altec Indus., Inc. , 605 F.3d 839, 841 n.1 (11th Cir. 2010) ; Klay v. United Healthgroup, Inc. , 376 F.3d 1092, 1106 (11th Cir. 2004) ; Espinoza v. Galardi S. Enters., Inc. , No. 14-21244, 2018 WL 1729757, at *13 (S.D. Fla. Apr. 10, 2018) ; Walinbay S.A. v. Fresh Results, LLC , Nos. 13-60844 & 13-61546, 2014 WL 1259901, at *4 (S.D. Fla. Feb. 19, 2014).

The two other federal statutes invoked in the Complaint are FDCPA and RICO. FDCPA provides that an action to enforce liability may be brought in "any appropriate United States district court." See 15 U.S.C. § 1692k. RICO provides that any civil enforcement action may be brought "in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." See 18 U.S.C. § 1965(a). In this case, the analysis of proper venue under these statutes is subsumed within the § 1391 analysis. Cf. Fiorani v. Chrysler Grp. , 510 F. App'x 109, 111 (3d Cir. 2013) ("[V]enue over RICO claims is controlled by both 18 U.S.C. § 1965(a) and the general venue provisions contained in 28 U.S.C. § 1391."); Walker v. Nationstar Mortg., LLC , 142 F. Supp. 3d 63, 67 (D.D.C. 2015) (noting that FDCPA "contains a very general venue provision" but that § 1391"limits the reach" of the general venue provision").

The Court takes judicial notice that Watauga County is located in the Western District of North Carolina.

The best inference the Court can draw is that Chase should have sent the notification from Jacksonville, Florida (see Compl. Ex. D).

Rather than conducting a "residency" analysis under § 1391(b)(1) to explain why they believe venue is proper, however, Plaintiffs devote the bulk of their Reply analyzing the factors of 28 U.S.C. § 1404(a) -a statute which presupposes that venue here is proper. See, e.g., Jumara v. State Farm Ins. Co. , 55 F.3d 873, 878 (3d Cir. 1995) ; see also 14D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3827 (4th ed. Oct. 2018 update) ; 15 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3842 (4th ed. Oct. 2018 update). Plaintiffs here have not established that venue in this District is proper; therefore, § 1404(a) is inapposite.

See Flood v. Avis Budget Grp. , 2010 WL 11504771, at *3 & n.4 (S.D. Fla. June 30, 2010) ; XR Co. v. Block & Balestri, P.C. , 44 F.Supp.2d 1296, 1298, 1302 (S.D. Fla. 1999).